RANDALL *v.* UNION TRUST CO.

TROVER AND CONVERSION—BONDS—PLEDGE—PAYMENT.

In an action for the conversion of certain street-railway bonds, pledged as security for the payment of the construction and equipment of a street railway, evidence examined, and *held*, that the bonds were not pledged as security merely, but that plaintiff and his associates, who were the active promoters of the enterprise, occupied relations analogous to a partnership, and that defendant was authorized by an agreement with plaintiff's associates on the final settlement of the corporate affairs to destroy the bonds.

Error to Wayne; Mandell, J. Submitted January 18, 1909. (Docket No. 33.) Decided April 6, 1909.

Trover by James A. Randall against the Union Trust Company. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Affirmed.

*John J. Speed* ( *Fred A. Baker*, of counsel), for appellant.

*Russel, Campbell, Bulkley & Ledyard* (*Orla B. Taylor* and *Henry M. Campbell*, of counsel), for appellee.

HOOKER, J.   James A. Randall, the plaintiff, Seymour Brownell, and Edward W. Voigt, embarked in an enterprise of building an electric railway from Detroit to Farmington, with two branches, one to Orchard Lake and another to Southfield.  In furtherance of this design, they organized a railroad corporation with a capital stock of $500,000; the three persons named being subscribers for nearly all of the stock in substantially equal proportions.

It is stated by counsel for defendant—and we discover nothing to the contrary—that no cash was put into this enterprise; it being the scheme of these parties to provide for building and equipping the road by a sale of its bonds to the public.   Accordingly an issue of $900,000 in bonds was authorized and made.  Substantially coincident in point of time, and as part of the plan, the same parties organized the Wolverine Construction Company, with a capital of $20,000, of which $5,000 was paid in.   When the bonds were provided for, the arrangement appears to have been that $260,000 should be delivered to Randall, Voigt, and Brownell as the price of two short stub lines, which they appear to have owned and which they conveyed to the Detroit & Northwestern Company, $80,000 were to be set aside for the Southfield branch, and the remaining $560,000 were to be used to build and equip the road.   It is obvious that, if this plan had not miscarried, the three persons mentioned (with a few nominal associates) would have owned all of the stock of the road and $260,000 of bonds.   Accordingly the Detroit & Northwestern Company made its mortgage of the property to the Union Trust Company, its trustee, to secure said bonds.   The date of this mortgage appears to have been omitted from the record, but we assume that it was May 1st; that being mentioned in a contract of that date as the date of the bonds.   That contract was executed by the Wolverine Construction Company, Randall, Randall, trustee, Brownell, and Voigt, as parties of the first part, and Frederick W. Hayes, party of the second part.   It

recited the execution of the bonds and mortgage, and the fact that they were owned as follows: Wolverine Construction Company, $640,000; Voigt, Brownell, Randall, and Randall, trustee, $260,000. It provided that Hayes should sell *for the parties of the first part* all of said bonds at prices stated. The proceeds should be paid over to the parties to whom they belonged; i. e., $640,000 to the Wolverine Construction Company and $260,000 to "the *other parties of the first part*, according to conditions" thereinafter contained. It also provided for compensation for this service. It provided, further, that the $260,000 bonds "belonging to parties of the first part, other than the Wolverine Construction Company," should be delivered to Hayes at once, and they should be held by him, and the Preston National Bank, of which he was president, in part as security "for the debt" to said bank of $160,000, "for which said debt said parties of the first part other than the said Wolverine Construction Company, Ltd., are obligated to said bank. Said bonds shall also be held in part as a guarantee for the completion and full equipment of said railway." Said contract provided:

"Out of said $260,000 face value of said bonds so delivered to the party of the second part, he shall hereafter sell, as convenient to him, and on or before January 1, 1900, a sufficient number thereof at the price above stipulated to pay to the Preston National Bank the sum of $60,000 to be applied upon certain indebtedness of $160,000, and also a further sufficient number to pay the sum of $6,000 now owing to Edward W. Voigt, from the said the Detroit & Northwestern Railway Company, provision for the payment of which is made by the delivery to said Edward W. Voigt, Seymour Brownell, James A. Randall, and James A. Randall, trustee, of its bonds, being part of the said $260,000 of bonds above mentioned. The balance of the funds in the hands of the party of the second part arising from the sale of said bonds to raise said sum of $66,000 being under $1,000 shall be by the said second party paid to the Preston National Bank upon the balance of said debt of $160,000. The residue of said $260,000 of bonds then remaining in the hands of the party of the sec-

ond part, after said sale to raise said sum of $66,000 or the proceeds arising from the sale thereof, shall be by him retained until said railway is fully equipped and completed, when, if any are unsold, they shall be sold by the party of the second part at the price above stipulated, and the proceeds thereof, together with any cash in his hands arising from the sale of bonds, shall be used, *first*, to liquidate the balance of the said debt of $160,000; and, *second*, the remainder shall be paid over by the party of the second part to the parties of the first part hereto, except the said the Wolverine Construction Company, Limited, upon their joint receipt therefor."

Other provisions more particularly relating to the Wolverine Company, its obligations and rights, are omitted, being unimportant in this connection.   The contract also includes the following provision:

"It is understood and agreed that this contract is made for the purpose of providing the necessary funds as needed to construct said extensions and improvements, and to provide the necessary material therefor, and that said the Wolverine Construction Company, Limited, has entered into contracts for materials, and will enter into contracts for the purpose of further materials and for the performance of work relying upon the proceeds of sales of said bonds to pay for the same; and, if said sales are not made fast enough to provide funds as required to purchase said materials and pay for said work, it shall be competent for said first parties to terminate this contract on that ground after such default by giving fifteen days' notice in writing to said second party of their intention to so terminate the same on that ground, provided that within such fifteen days such default is not made good."

The bonds were guaranteed by the Union Trust Company, and all but the $80,000 were issued. They were never issued and are of no significance in the controversy.

The road was completed and equipped, and by the end of 1900 the company was insolvent, the road having cost it upwards of $1,000,000, represented by its bonds and its debts up to that time. It is said that the bonds netted less than $450,000, and that the remainder of the cost was

provided for by obligations of the company, some of which were secured by the $260,000 bonds, which belonged to the projectors of the road, collectively; the rest being carried upon the indorsement of the projectors, including Randall. It became evident that, if the projectors did not make some provisions for the outstanding obligations, the road must go under the hammer at a large loss. An arrangement was finally made for its sale to the Detroit United Railway. This agreement was in writing and is somewhat lengthy. In brief, it was that the Detroit & Northwestern agreed to sell its railway and sell its property free and clear from all debts and obligations as of date May 1, 1901, for $855,000, payable in gold bonds, the same to be part of an authorized issue of $1,000,000 of bonds of said date, to be issued by the Detroit & Northwestern Railway or a new street railway to be organized to take over the property, the payment of principal and interest to be assumed by the Detroit United Railway. It was also agreed that not less than $489,300 of the capital stock should be transferred to the Detroit United Railway. This agreement, containing a guarantee and many other provisions, was duly executed. The agreement was carried out, payment being made of all outstanding obligations; Mr. Voigt and perhaps others paying in the aggregate $200,000 or thereabouts in addition to the $855,000 of bonds which were applied through the Union Trust Company. The outstanding first mortgage bonds were obtained either for cash or by exchanging the second mortgage bonds for them. The $260,000 bonds held by the Union Trust Company to whom they had been delivered by Hayes were destroyed. To carry out the undertaking, it was necessary to use Randall's stock. This he assigned to Hecker, but, as he was an indorser under an agreement with his associates dated July 10, 1900, he required and obtained assurances of protection therefrom, and paid no part of the loss sustained by his associates through their payment of a deficiency of about $200,000. He also obtained the sum of $10,000 to be paid to his wife, for

whom he appears to have been trustee. The matter being brought to a conclusion in the way stated, Mr. Randall made a claim that, the debts being paid, he was entitled to one-third of the $260,000 of bonds issued to his associates and himself, and brought this action against the Union Trust Company, in whose possession they were when destroyed and the mortgage discharged for their conversion. His claim was, in brief, that they were deposited as security, that they were never lawfully sold and applied, and that upon payment by the Detroit & Northwestern of its debts, for which he and his associates were mere sureties, they were discharged and entitled to their bonds, or, as stated in one of the briefs of the plaintiff:

"Under the law of sureties, Randall's entire one-third interest in the 259 bonds was released and discharged from all liability the moment the indebtedness of $188,353.82 for which they were collateral was paid, without regard to the method or means by which the Detroit & Northwestern Railway issued the securities or raised the money to make the payments."

If this were a case where Randall and his associates stood in the position of a mere surety to the Detroit & Northwestern Railway Company, and the Detroit & Northwestern Railway Company managed to perform the obligation for which they were sureties, there would be more force in the contention of plaintiff's counsel that they were released from their obligation and entitled to their stock, but there is more to this case than that. If the arrangement that the three promotors entered into and maintained throughout was not sufficient to make them copartners in the enterprise, it certainly had some resemblance to a copartnership. So far as we can judge from the circumstances, they owned the stub lines in common. It is true we do not know in whose name that property stood. We do not know whether they acquired them by purchase of stock; indeed, we do not know that those lines were ever owned by any corporation issuing stock until they were sold or turned over to the Detroit &

Northwestern Company, nor how this was accomplished. These things are unimportant, but we do know from this record that the price received was $260,000 of bonds. They do not appear to have been issued to the respective individuals, or delivered to them individually. Apparently they were turned over to the promoters. They do not appear to have been taken with the expectation of immediate division as the proceeds of a sale of property held in common. On the contrary, they were to be used in the further transactions because they were necessary to secure their joint obligations, given for the stub lines perhaps, and to help float the remainder of the $900,000 of bonds, through which they hoped to ultimately acquire practically the roads they had just sold, a new railroad, and whatever they could save of the $260,000 bonds. They continued this enterprise until their road was built and equipped and overloaded with debt, for which they were all personally liable, to a greater or less extent, by reason of their personal indorsements. Then it was that they attempted to save what they could out of the wreck. Can any one doubt that these three men were under relations to each other that required them to share the profits and losses, that they so understood it, and that a court of equity would have compelled it whether it called them copartners or not ? We have no difficulty in finding clear evidence in this record warranting the conclusion that Randall knew and consented to this sale, and that he did not suppose that the Detroit & Northwestern Company could comply with the terms of the agreement to pay all of its debts including these bonds from its own resources. None of the parties expected it to. We believe that Randall was not ignorant of the price received, viz., $855,000, nor do we believe that he ever thought it could pay $900,000 of bonds and accrued interest, besides other debts, with that sum, which was the only property that it could have after the sale, under the terms of the contract, for it agreed to sell all. He knew that his associates must pay large sums because of their mutual in-

dorsements, increased because of his own release therefrom, yet he would have us say that he supposed the $260,000 of bonds due to the promoters were to be paid by them also. We are unable to believe in any such understanding on the part of anybody, and we have no doubt of the justice of the conclusion that it was expected that the $260,000 of bonds held in common by these persons were to be canceled after satisfaction of the debts they were given to secure, and that Voigt and Brownell had the right to have this done, and it is in our opinion a perfect defense to the action, as to the Union Trust Company.

We find no error, and the judgment is affirmed.

BLAIR, C. J., and GRANT, MONTGOMERY, and MOORE, JJ., concurred.